IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ETHLOKIA PLUMBER *ex rel.* K.W., | § | |
| | § | |
| *Plaintiffs,* | § | |
| v. | § | Civil Action No. 4:20-CV-00672 |
| | § | |
| HARRIS COUNTY DEPARTMENT | § | |
| OF EDUCATION, | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

**Page**

I.  SUMMARY OF THE ARGUMENT ......................................................... 1

II.  STATEMENT OF THE ISSUES............................................................... 1

III.  STATEMENT OF FACTS ...................................................................... 1

    A.  *Harris County Department of Education* .................................... 1

    B.  *HCDE's policies and practices relating to restraint* .................... 2

    C.  *Assault of K.W* .......................................................................... 6

IV.  ARGUMENT ........................................................................................ 7

    A.  *Standard of Review* .................................................................... 7

    B.  *Plaintiffs have evidence of a constitutional violation* ................ 8

        1.  HCDE's official policies and widespread customs were the moving forces behind the deprivation of K.W.'s rights........................... 8

        2.  Campus administrators are executors of policy and custom...................... 9

        3.  HCDE's widespread practices and customs regarding restraints caused K.W.'s injuries ........................................................................ 10

    C.  *HCDE violated Section 504 and the ADA* ......................................... 11

        1.  Exhaustion is not required because the IDEA does not apply to HCDE .. 11

        2.  HCDE discriminated against K.W. because of his disabilities, violating the ADA and Section 504 ................................................................ 13

            a.  HCDE failed to provide K.W. his necessary disability-related accommodations despite direct knowledge of both his disability and need for specific accommodations ................................ 13

            b.  HCDE intentionally discriminated against K.W. by reason of his disability ................................................................................ 16

V.  CONCLUSION........................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................................................7

*Brown v. Coulston*.
  463 F. Supp. 3d 762 (E.D. Tex. 2020) .................................................................19

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..................................................................................................7

*Cooper Tire & Rubber Co. v. Farese*,
  423 F.3d 446 (5th Cir. 2005) ..................................................................................7

*Delano-Pyle v. Victoria Cty. Tex.*,
  302 F.3d 567 (5th Cir. 2002) ........................................................................13, 18

*Washington ex rel. J.W v. Katy Independent School District*.
  403 F. Supp. 3d 610 (S.D. Tex. 2019) ............................................................18, 19

*Mark V. v. N.E. Independent School District*
  455 F. Supp. 2d 577 (W.D. Tex. 2006)..................................................................12

*Meadowbriar Home for Children, Inc. v. G.B. Gunn*,
  81 F.3d 521 (5th Cir. 1996) ....................................................................................8

*Monell v. Dept. of Soc. Servs. of City of New York*,
  436 U.S. 658 (1978)..................................................................................................9

*Piotrowski v. City of Houston*,
  237 F.3d 567 (5th Cir. 2001) ................................................................................10

*Reyes v. Manor Independent School District*
  850 F.3d 251 (5th Cir. 2017) ................................................................................12

*Rideau v. Keller Independent School District*,
   978 F. Supp. 2d 678 (N.D. Tex. 2013) .................................................................18

*Round Rock Indep. Sch. Dist. v. Amy M.*,
  2021 WL 2102837 (W.D. Tex. May 19, 2021) .....................................................19

*S.C. v. Round Rock Independent School District*,
  2020 WL 5351077 (W.D. Tex. Sept. 4, 2020)........................................................19

*Taylor v. Richmond State Supported Living Ctr*,
  2012 WL 6020372 (S.D. Tex. Nov. 30, 2012) ......................................................19

*Wilson v. City of Southlake*,
    936 F.3d 326 (5th Cir. 2019) ...................................................................11, 12, 13

*Windham v. Harris Cty., Tex.*,
    875 F.3d 229 (5th Cir. 2017) .................................................................................13

**Statutes**

ADA ..............................................................................................................................1

Americans with Disabilities Act Title II ............................................................. *passim*

Rehabilitation Act of 1973 Section 504 .............................................................. *passim*

Texas Education Code 17 ...........................................................................................1

**Other Authorities**

19 Tex. Admin. Code § 89.1053(b) ..............................................................................8

19 Tex. Admin. Code § 89.1053(c) ..............................................................................8

14 U.S. Const. (Amendment) .......................................................................................8

Fed. R. Civ. P. 30(b)(6) ...............................................................................................1

Fed. R. Civ. P. 56 ........................................................................................................7

Fed. R. Evid. 1006 ......................................................................................................4

Texas Administrative Code, Title 19, Section 89.1053 ................................................2

## I.    SUMMARY OF THE ARGUMENT

Plaintiffs file this response in opposition to Defendant's Amended Motion for Summary Judgment. Dkt. 34. Plaintiff K.W. is a student with a disability who was placed at Academic Behavior School East ("ABS East"), a self-contained special education campus run by Defendant Harris County Department of Education ("HCDE"). On his first day at the school, he was assaulted by the Physical Education coach, Herbert Allen, Jr., who used unlawful restraints, forcefully throwing K.W. to the ground. This assault caused lasting physical and emotional damage to K.W., including a broken collarbone, a brain injury causing headaches and seizures, and Post-Traumatic Stress Disorder (PTSD).

Although the injury to K.W. occurred in February 2018, the policies and procedures of HCDE that caused his injury were in place before he was assaulted.  Because of HCDE's actions, K.W. was subjected to illegal, discriminatory physical abuse and excessive force in violation of the Fourteenth Amendment to the United States Constitution.  Additionally, HCDE is liable for Allen's failure to accommodate K.W.'s disabilities, in violation of Title II of the Americans with Disabilities Act (42 U.S.C. § 12131, *et seq.*, "ADA") and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794, "Section 504").  There are, at a minimum, genuine issues of material fact as to each of these claims.  Summary judgment should be denied.

## II.    STATEMENT OF THE ISSUES

1.    Summary judgment should be denied because a genuine issue of material fact exists as to whether HCDE violated K.W.'s constitutional rights.

2.    Summary judgment should be denied because a genuine issue of material fact exists as to whether HCDE violated the ADA and Section 504.

## III.    STATEMENT OF FACTS

### A.    Harris County Department of Education

1

HCDE is a public county school district as defined by the former Texas Education Code 17. ABS East is a campus run by HCDE and is a behavior campus that only serves students with disabilities who receive special education under the federal law.  Local school districts and public charter schools contract with HCDE to provide educational-related services to students with disabilities. Ex. A-9 (HCDE and Harmony contract).

On May 26, 2021, HCDE designated Assistant Superintendent Jonathan Parker as its organizational witness under Federal Rules of Civil Procedure 30(b)(6).  Ex. A-4 (Parker Dep. 1, 15:14–25, 16:1–25, 17:1–25, 18:1–25, 19:1–25, 20:1–7) (As HCDE's organizational designee, Parker's testimony included "knowledge of HCDE's policies and procedures relating to the use of restraint.").  In addition, as the organizational witness, Parker testified that HCDE was adopting as its own the testimony of former ABS East principal Mindy Robertson and ABS East aide and CPI trainer Dale Jackson.[1] *Id*. at 17:1–25, 18:1–25. 19:1–25, 20:1–7.

## B.    HCDE's policies and practices relating to restraint

To fulfill its responsibilities to the sending school districts, HCDE must comply with Texas Administrative Code, Title 19, Section 89.1053, Commissioner's Rules Concerning Special Education Services.  Ex. A-1 (TEA Cypress-Fairbanks decision, finding Cy-Fair violated 19 TAC 89.1053 because of the actions of HCDE staff).  Section 89.1053 requires that a core team of school personnel, as well as all those who perform restraints, "receive instruction in current professional accepted practices and standards regarding behavior management and the use of restraint."  19 TAC

---

[1] As HCDE's organizational designee, Parker testified that HCDE was also adopting the testimony of former ABS East principal Mindy Robertson for the following topics: knowledge of reports and complaints made to HCDE regarding injuries resulting from the restraint of students; knowledge of the discipline and/or termination of staff relating to the restraint of students; knowledge of investigations and/or reports by third parties relating to the restraint of students. Parker Dep. 17:4–25, 18:1–25, 19:1. Parker also testified that he was adopting the testimony of HCDE trainer and ABS East aide Dale Jackson related to knowledge of training provided the HCDE staff on the use of restraints.  *Id*. at 17:21–24, 19:2–25, 20:1–8.

89.1053(3).   HCDE adopted CPI, also known as the Crisis Prevention Institute, as its crisis prevention and restraint training program.  Ex. A-4 (Parker Dep. 7:6–8).  CPI is a leader in evidence-based de-escalation and crisis prevention and provides trainings on de-escalation and physical holds or restraints.  Ex. B, Hippe Dec. ¶2.  CPI provides direct training to individuals, as well as training to those who wish to become certified trainers so that they may in turn train others in their organizations.  *Id*.  HCDE has sent individuals to instructor certification programs for two of CPI's classes, Nonviolent Crisis Intervention and Nonviolent Crisis Intervention with Advanced Physical Skills (previously named Applied Physical Training).  Ex. A-10 (D. Jackson CPI Training Record).  The Nonviolent Crisis Intervention course teaches de-escalation techniques as well as skills to recognize and respond to crisis situations.  Ex. B, Hippe Dec. ¶4.  It also teaches the risks related to holds, which include psychological and physical dangers.  *Id*.  Dale Jackson, a paraprofessional at ABS East, attended the Nonviolent Crisis Intervention Training Program in August 2015 and became a certified trainer.  Ex. A-10 (D. Jackson CPI Training Record).

The Nonviolent Crisis Intervention with Advanced Physical Skills course teaches higher-level holds for higher risk situations. Ex. B, Hippe Dec. ¶8.  This course teaches the emergency floor procedure, which is to be used when the person being restrained moves to the floor.  *Id*. at ¶9.  This course does not and has never included the teaching of any hold that involves the person doing the restraint initiating a move of the person in crisis to the floor.  *Id*. at ¶10.  CPI teaches that there are risks associated with initiating a move to the floor, including potential injury from the impact with the floor and the risk of asphyxiation. *Id.*

Despite adopting CPI as its program, administrators and staff at ABS East have failed to follow CPI's program in many significant ways and have fundamentally altered the program by relying on the use of floor restraints and regularly moving students in crisis to the floor.

First, administrators and staff at ABS East relied almost exclusively on the use of floor restraints, despite the dangers associated with this high risk and high level of force hold.  As shown in the chart below, for a two-year period, of the 482 restraint reports produced by HCDE for ABS East, 435 of these incidents involved at least one floor restraint.[2]



**Figure 1**

Additionally, ABS East's use of the floor restraint often involved a move to the floor initiated by the person doing the restraint, which is in direct contradiction to the training of CPI.  As stated by John Hippe, Director of Professional Development for CPI, CPI's philosophy is to manage the person in crisis in his or her current position, as this is usually safest for both the person being restrained as well as the person doing the restraint.  Ex. B, Hippe Dec. ¶10.

The chart below shows the number of floor restraints that were documented as being done at the direction of school administrators. [3]

---

[2] The chart is admissible pursuant to Federal Rule of Evidence 1006.  The chart summarizes content from the Written Summary of Non-Violent Physical Crisis Intervention Use forms produced by HCDE in discovery.  The forms are available to HCDE or for production to the Court.
[3] The chart is admissible pursuant to Federal Rule of Evidence 1006.  The chart summarizes content from the Written Summary of Non-Violent Physical Crisis Intervention Use forms produced by HCDE in discovery.  The forms are available to HCDE or for production to the Court.



**Figure 2**

Moreover, school administrators directed staff to use the floor restraint, which required staff to initiate a move to the floor.  Dale Jackson testified that he was part of restraints where school administrators directed him to move the student to the floor.  Ex. A-5 (Jackson Dep. 93:10–17). This practice is confirmed by the restraint forms.  Ex. A-11 (Non-Violent Physical Crisis Intervention forms).

HCDE also failed to follow CPI's trainings and practices in other significant ways.  First, CPI requires that its trainers only teach the content of the program for which the trainer is certified. Ex. B, Hippe Dec. ¶14.  Thus, a certified trainer who has not completed the certification course for Advanced Physical Skills cannot teach the more advanced holds that are taught in this class.  Prior to 2019, Dale Jackson was only certified to teach the lower-level class, nevertheless he testified that he covered all of the holds when he trained ABS East staff, including the emergency floor restraint. Ex. A-5 (Jackson Dep. 34:21–24).  Also, Mr. Jackson testified that the initial CPI training for staff was 8 hours; CPI's guidelines provide that the Nonviolent Crisis Intervention training is 13 hours and the advanced class is 19 hours.  Ex. B, Hippe Dec. ¶15.  Mr. Jackson also testified that he could not remember training on the risks of restraints, what the risks were, or what steps to do after a

restraint during his training sessions, all of which are part of the CPI training. Ex. A-5 (Jackson Dep. 124:10–125:6; 142:8–144:10); Ex. B, Hippe Dec. ¶¶ 6, 7.

Herbert Allen, Jr., who unlawfully restrained K.W., received his CPI training from Mr. Jackson after he was hired in January 2017. Ex. A-11 (Non-Violent Physical Crisis Intervention forms). Mr. Jackson also provided an additional 45 minutes of training to ABS East staff, including Allen, on February, 20 2017. Ex. A-12 (Query H. Allen Training). HCDE provided a four-hour refresher on CPI to all staff in August 2018, but according to the sign in sheet, Mr. Allen was not present. Ex. A-13 (Aug. 2018 CPI Training Log). When Mr. Jackson trained Mr. Allen, he had not completed the Advanced Physical Skills certification course and should not have taught Mr. Allen the more advanced holds, including the emergency floor restraint. Even if Mr. Jackson had been properly certified, Mr. Allen's amount of training, 8 hours, was significantly less than called for by CPI for either the lower-level course (13 hours) or the advanced course (19 hours).

Not surprisingly, other HCDE students have been subjected to these unlawful restraints. For example, on November 7, 2017, another student at an HCDE campus, ABS West, was improperly restrained by staff members, resulting in a TEA complaint with findings against CyFair ISD for the actions of HCDE staff members. Ex. A-1 (TEA Complaint and Cypress Fairbanks ISD Decision). The Superintendent and the Board were aware of the incident and the TEA complaint. Ex. A-7 (Colbert Dep. 31:23–32:1).

## C.    Assault of K.W.

K.W. was placed at ABS East by a special education committee meeting on Feb. 22, 2018. Ex. A-14 (K.W. IEP). Principal Mindy Robertson attended this meeting and signed to indicate her agreement with K.W.'s Individualized Education Program (IEP), which included both the accommodations HCDE would provide to K.W. and his Behavior Intervention Plan (BIP). *Id*. K.W.'s BIP was developed by this committee to assist K.W. with behaviors relating to his disability.

*Id.*

K.W.'s first day at ABS East was Feb. 26, 2018.  That morning, he attended his physical education class. During the class, as described by Principal Robertson after conducting an investigation and watching a video of the incident:

> Mr. Allen was face-to-face with the student, grabbed the student, threw him to the gym floor, got on top of the student, then stood up and flung him to the floor two more times . . . The student was in a defenseless position against the wall, and was grabbed, then thrown to the floor.

Ex. A-16 (Incident Report).  Principal Robertson recommended Mr. Allen's termination and reported Mr. Allen to CPS, which subsequently found probable cause of abuse.  Ex. D, Plumber Dec. ¶2.

## IV.  ARGUMENT

### A.  Standard of Review

Summary judgment is only appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Only if the moving party has met that burden is the non-movant required to come forward with specific facts showing that there is a genuine issue for trial. *Id.* at 324.  In deciding a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005) ("We construe all facts and inferences in the light most favorable to the nonmoving party when reviewing ... [a] summary judgment.") (citation omitted).

**B.** **Plaintiffs have evidence of a constitutional violation**.

HCDE is not entitled to summary judgment because the evidence shows that HCDE violated K.W.'s rights to due process under the U.S. Constitution. As a result of HCDE's official policies and widespread customs, a teacher employed by HCDE, knowing K.W. was a student with a disability entitled to appropriate positive behavioral supports, used an illegal and dangerous restraint on K.W., violating his constitutional rights and causing him physical injury.

> **1.** **HCDE's official policies and widespread customs were the moving forces behind the deprivation of K.W.'s rights.**

HCDE's policies, procedures, persistent and widespread practices, and customs were the moving forces that deprived K.W. of his rights and caused his injuries. An entity is liable if: "1) a policy or custom existed; 2) the governmental policy makers actually or constructively knew of its existence; 3) a constitutional violation occurred; and 4) the custom or policy served as the moving force behind the violation." *Meadowbriar Home for Children, Inc. v. G.B. Gunn*, 81 F.3d 521, 532–33 (5th Cir. 1996) (citing *Palmer v. City of San Antonio*, 810 F.2d 514, 516 (5th Cir. 1987)).

HCDE 1) had policies and customs 2) published in its Student Handbook for HCDE ABS East and West 3) that conflicted with state law and violated the Fourteenth Amendment of the Constitution of the United States and 4) created an inherently dangerous situation that served as the moving force behind the violation of K.W.'s rights, leading to his injuries. The 2017–2018 Student Handbook for ABS East and West states that physical restraint is used when a student "is endangering him/herself, staff members, other students or property," and it states that restraint "may also be used to enforce the contingencies of the behavior intervention plan." Exs. A-4 (Parker Dep. 58:16–17); A-17 (Student Handbook Restraint Policy). The Texas Administrative Code is clear that restraint may only be used to protect from an "imminent" danger to students, other persons, or property, and not for any other purpose, such as education, punishment, or compliance. 19 Tex.

Admin. Code § 89.1053(b), (c).  The Board-sanctioned policy in the Handbook condones using restraint for purposes that violate state law and the constitutional rights of any student with a disability whose behavior intervention plan advocates compliance with directives and/or encourages or discourages certain behaviors.  Exs. A-4 (Parker Dep. 58:1–-17); A-17 (Student Handbook Restraint Policy).  Board policy (in an appendix of the Handbook) gives additional reasons for restraints that are unrelated to protection from "imminent" harm.  These include moving a student from one location to another if the student refuses "a lawful command of a school employee . . . in order to restore order or to impose disciplinary measures," as well as controlling an "irrational student."  Ex. A-18 (Student Handbook Appendix Board Restraint Policy).

### 2.    Campus administrators are executors of policy and custom.

Campus administrators execute day-to-day policy to such an extent that their decisions represent official policy and create widespread practices and customs.  A local government entity, such as HCDE, is liable under § 1983 when an employee's "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" violates rights.  *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95 (1978).  HCDE's administrators, rather than the Board, exerted direct control over the execution of policies and procedures that influence the day-to-day customs at campuses. HCDE's administrators condoned shortened training hours from those required for actual CPI certification and repeatedly allowed and even directed staff to administer dangerous floor restraints for which administrators and staff were not properly trained.  Ex. A-5 (Jackson Dep. 14:19–24, 33:16–20, 34:7–24, 63:8–19, 65:8–22, 66:6–9, 67:4–13, 69:13–17 70:6–18, 81:5–16, 92:3–93:6, 103:12–104:15, 105:16–25); *Proportion of Floor Restraints Directed by Administrator(s)*, *supra* fig. 2; *see* Ex. B, Hippe Dec. ¶¶ 3–4, 15.  Administrators directed at least 106 floor restraints out of the 482 total restraint forms reviewed.  *Administrator(s)*, *supra* fig. 2. The recent administrators'

meeting where staff was directed to discontinue floor restraints is further evidence of their control over widespread practices and customs. Ex. A-5 (Jackson Dep. 144:22–146:18).  While HCDE is not subject to liability under *respondeat superior* for constitutional violations, merely asserting that the Board is the sole policymaker without analysis does not negate the evidence that performing dangerous floor restraints by untrained staff was standard operating procedure—i.e. policy and custom—at HCDE because of administrator direction and supervision.

### 3. HCDE′s widespread practices and customs regarding restraints caused K.W.′s injuries.

The persistent, widespread practice of HCDE's employees using unnecessary, unauthorized, illegal, and/or dangerous restraints was the moving force that caused K.W.'s injuries.  An official policy or custom "is ordinarily contained in duly promulgated policy statements, ordinances or regulations.  But a policy may also be evidenced by custom" if it "is so common and well-settled as to constitute a custom that fairly represents municipal policy . . . ." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)).

HCDE had a persistent, widespread, common, and well-settled practice of restraining students inappropriately using dangerous and illegal floor restraints.  Ex. A-5 (Jackson Dep. 14:19–24, 33:16–20, 34:7–24, 63:8–19, 65:8–22, 66:6–9, 67:4–13, 69:13–17 70:6–18, 81:5–16, 92:3–93:6, 103:12–104:15, 105:16–25); *see Floor Restraints vs. Non-Floor Restraints*, *supra* fig. 1; *Administrator(s)*, *supra* fig. 2.  Restraints were commonly used when students were merely non-compliant rather than a danger to themselves or others.  Ex. A-5, (Jackson Dep. 115:13–116:25). Restraints were regularly used absent required positive behavioral supports and de-escalation techniques. Ex. A-5 (Jackson Dep. 106:1–107:6). Non-CPI compliant restraints were regularly used. Ex. A-5, (Jackson Dep. 66:6–9, 67:4–13); Ex. B, Hippe Dec. ¶3.  Restraints requiring special

training were regularly attempted by those without such training. Ex. B, Hippe Dec. ¶3; Ex. A-5 (Jackson Dep. 14:19–24, 33:16–20, 34:7–24, 65:8–22, 69:13–17, 70:6–18, 81:5–16, 92:3–93:6, 105:16–25); *Floor Restraints*, *supra* fig. 1. Dangerous floor restraints were regularly used. Ex. A-5 (Jackson Dep. 65:8–22, 66:6–9, 67:4–13, 81:5–16, 92:3–93:6, 105:16–25, *see also* Ex. B, Hippe Dec. ¶3. Absent serious injury and/or parent complaint, administrators commonly allowed staff to use floor restraints without consequence and even **directed** staff to use them on a routine basis. Ex. A-5 (Jackson Dep. 65:8–22, 66:6–9, 67:4–13, 81:5–16, 92:3–93:6, 105:16–25); *Administrator(s)*, *supra* fig. 2. These regular occurrences are further evidence of an inappropriate policy and widespread customs existing prior to and at the time K.W. was injured. Contrary to HCDE's arguments, this lawsuit concerns a persistent pattern at HCDE and not merely a single incident.

HCDE asserts that K.W.'s injuries are merely due to a "single restraint incident with one teacher." Motion for Summary Judgment, p. 13. Not so. The evidence demonstrates that HCDE had a custom of using inappropriate restraints such as floor restraints and of using restraints absent emergencies instead of de-escalation techniques and positive behavioral supports. And there is a direct, causal link between this unlawful custom and the deprivation of K.W.'s rights. Because restraints were commonly used for non-compliance, K.W. was restrained for non-compliance rather than for being an actual threat to himself or others. Because Non-CPI restraints such as take-downs were regularly used, K.W. was forced to the floor several times. The widespread policies and customs of HCDE were the moving forces resulting in an employee, Mr. Allen, who "threw [K.W.] to the gym floor, got on top of the student, then stood up and flung the student on the floor two more times." Ex. A-16 (Incident Report).

**C.    HCDE violated Section 504 and the ADA**.

   **1.    Exhaustion is not required because the IDEA does not apply to HCDE.**

It is undisputed that HCDE is not subject to the IDEA and that K.W. was precluded from

11

pursuing IDEA related claims against HCDE.  *See* Ex. C-1 (HCDE's Reply); C-2 (Hearing Officer's Order).  Therefore, the IDEA exhaustion requirement and any heightened standard for IDEA-related ADA and Section 504 claims are not applicable in this case, and HCDE's reliance on the holdings from *Mark V. v. N.E. Independent School District* and *Reyes v. Manor Independent School District* is misplaced. 455 F. Supp. 2d 577 (W.D. Tex. 2006); 850 F.3d 251 (5th Cir. 2017)*.*

The Fifth Circuit's decision in *Wilson v. City of Southlake* is instructive*.* 936 F.3d 326, 327–28 (5th Cir. 2019).  In *Wilson*, the court did not apply the IDEA exhaustion requirement or any IDEA-related heightened standard for ADA and Section 504 claims which involved actions by a school resource officer ("SRO") who provided services to a school district. *Id*. The school district had a memorandum of understanding with the local police department to provide services in the form of SROs.  *Id.*  The SRO who was alleged to have discriminated against the student with disabilities had knowledge and access to the student's accommodations listed in his BIP and IEP and provided services in an educational setting, yet the court did not extend the IDEA-related heightened standard for ADA and Section 504 claims to the City of Southlake. *Id.* at 328, 332. Additionally, the court makes no mention of the student having to exhaust IDEA-related administrative remedies before filing his ADA and Section 504 disability discrimination claims against the City of Southlake. *Id.* at 329–30.

Here, Harmony Public Schools similarly has a contract with HCDE for services. Ex. A-9 (HCDE and Harmony contract). While HCDE had direct knowledge of K.W.'s IEP and his necessary disability-related accommodations, HCDE cannot be held liable under the IDEA, and HCDE argued for that outcome before the special education hearing officer. *See* Ex. C-2 (Hearing Officer's Order). Therefore, the IDEA exhaustion requirement and any heightened standard for IDEA-related ADA and Section 504 claims are not applicable.

### 2.   HCDE discriminated against K.W. because of his disabilities, violating the ADA and Section 504.

The evaluation of a claim of disability discrimination under the ADA and Section 504 are substantially the same except for their respective causation requirements.  *Wilson,* 936 F.3d at 330. To establish discrimination under the ADA, a plaintiff must 1) be a qualified individual within the meaning of the ADA; 2) be discriminated against by the public entity; and 3) and show that such discrimination is by reason of his disability. *Id.* (citing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672–73 (5th Cir. 2004)). Additionally, to recover monetary damages, a plaintiff must prove the discrimination was intentional. *Delano-Pyle v. Victoria Cty. Tex.*, 302 F.3d 567, 571 (5th Cir. 2002). The doctrine of *respondeat superior* applies to claims asserted under the ADA and Section 504.  *Id.* at 575. Therefore, a plaintiff is not required to identify a policy of discrimination. *Id.*

### a.   HCDE failed to provide K.W. his necessary disability-related accommodations despite direct knowledge of both his disability and need for specific accommodations.

It is undisputed that K.W. is a person with disabilities and, therefore, a qualified individual under the ADA and Section 504.  It is also undisputed that HCDE is a public entity.  A public entity's failure to reasonably accommodate the known limitations of persons with disabilities can also constitute disability discrimination.  *Windham v. Harris Cty., Tex.,* 875 F.3d 229, 235–36 (5th Cir. 2017).  A plaintiff can prevail by showing that "'the disability, resulting limitation, and necessary reasonable accommodation' were open, obvious, and apparent" to the defendant's agents.  *Id.* at 236–37 (quoting *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 164 (5th Cir. 1996)).

On February 22, 2018, four days before K.W. started attending HCDE's ABS East campus, HCDE gained direct knowledge that K.W. was a child with disabilities who was entitled to necessary, reasonable accommodations as a result of his disabilities.  Exs. A-6 (Robertson Dep.

13

14:20–15:7, 81:11–19); A14 (K.W. IEP).[4]  On February 20, 2018, HCDE staff, Principal Mindy Robertson and Transition Specialist Maxwell Otalor, attended and participated in K.W.'s IEP meeting at Harmony School of Ingenuity.  Ex. A-14 (K.W. IEP).  At this meeting, the committee decided to contract with HCDE and send K.W. to HCDE's ABS East campus. Exs. A-9 (HCDE and Harmony Contract); A-14 (K.W. IEP).[5]  Also during this meeting, the committee, including HCDE staff, discussed K.W.'s disabilities in detail, the impact of his disabilities, and the necessary disability-related accommodations that he should receive from HCDE staff while at ABS East.  Ex. A-14 (K.W. IEP).

This IEP specifically stated that as a result of K.W.'s disabilities, he "is not capable of following the student code of conduct therefore *a behavior plan is in place to [address] non-compliance, off task behavior, physical and verbal aggression*." Ex. A-14 (K.W. IEP 31) (emphasis added).  Additionally, the IEP described the impact of his disabilities as "[o]bservational characteristics of escalation triggering: (is noticeable 'uncomfortable', begins fidgeting in seat, gets up from seat and starts deflecting assignment, becomes verbally aggressive/frustrated)." *Id.* at 18.  During this meeting, the behavior plan was "reviewed and updated" and "[i]nstructional accommodations/modifications were updated to support [K.W.] in his classes." *Id*. at 31. Moreover, ABS East campus principal Mindy Robertson testified that ABS East teacher Herbert Allen, Jr. was required to implement K.W.'s IEP behavior plan and accommodations. Ex. A-6 (Robertson Dep. 84:6–85:11).

---

[4]  Robertson testified that K.W. was a student with disabilities entitled to receive accommodations and modifications in the educational setting. Ex. A-6 (Robertson Dep. 14:20–15:7, 81:11–19).  Further, Robertson testified that ABS East staff were required to implement K.W.'s behavior plan and provide the accommodations in the February 22, 2018 IEP.  *Id*.

[5]  The February 21, 2018 contract between HCDE and Harmony Public Schools included provisions in which HCDE agreed to implement the accommodations prescribed by a student's IEP.  Ex. A-9. The contract states "HCDE will be available for participation with the HPS ARD Committee in the development of the Individualized Education Plan (IEP). HCDE will update the HPS on the implementation of the IEP at least once a year." *Id*.

The February 22, 2018 IEP accommodations, pages 18–23, include the following:

- Teacher initiated cooling off: [K.W.] has had a consistent difficulty with academic and behavioral performance. Time dedicated and monitored by the teacher, counselor, or service provider to cool off in an instance of escalation will help de-escalate the student… This time should be quiet for [K.W.], isolated, and without interruption.
- Avoid power struggles.
- Provide cooling off period.
- Provide highly structured setting.
- Avoid physical contact.
- Reprimand student privately.

Ex. A-14 (K.W. IEP 18-31) According to the February 26, 2018 restraint records and Robertson's termination recommendation letter, ABS East teacher Herbert Allen, Jr. failed to provide any of these reasonable and necessary accommodations to K.W. before Allen "threw [K.W.] to the gym floor, got on top of the student, then stood up and flung the student on the floor two more times." Ex. A-16 (Incident Report); A-19 (Witness Statements); A-20 (Restraint Form); A-21 (Allen Termination Memo).  In her March 1, 2018 Incident Report, Robertson concluded that Mr. Allen did not follow Schools Divisions procedures and CPI strategies to de-escalate a student." Ex. A-16 (Incident Report).

Moreover, the February 26, 2018 video recording shows that Allen did not provide any of K.W.'s prescribed accommodations. Ex. A-15 (Video).  First, it is clear from the video that this P.E. class was not highly structured as students appeared to be just standing around a gym.  *Id.*  No organized activities or instruction occurred during the entire video.  *Id.*  From the start of the video, K.W. was standing with his back against the wall in the far corner of the gym while Allen moved away from K.W. towards another group of students approximately six feet away.  *Id.* at 00:00-00:20. ABS East aides Thomas Wilson and Harold Young were also present in the gym.  *Id.* at 00:00-00:20. Allen then turned around again to approach K.W., who had not moved and was still in the corner. *Id.* at 00:20-00:31.  Approximately fifteen seconds later, Allen grabbed K.W. and forcefully threw him to the ground. *Id.* at 00:45-00:50.

K.W.'s accommodations called for reprimanding him privately, away from other students, yet all of Allen's actions and communications were done publicly, in front of several students and other staff members.  *Id*. at 00:00-00:50.  Allen also failed to remove the other students from the gym so that he could address K.W.'s disability related behavior privately.  *Id*.  Moreover, Allen's display of physical aggression towards K.W. demonstrates that he did not attempt to avoid a power struggle or avoid physical contact with K.W.  *Id*.  This video also shows that Allen did not provide K.W. with a private and quiet place to cool off and self-de-escalate before he physically forced K.W. to the ground.  *Id*.

> **b.   HCDE intentionally discriminated against K.W. by reason of his disability.**

ABS East is a program that consists of only children with disabilities.  Ex. A-6 (Robertson Dep. 28:2–10).  Therefore, every child at ABS East is entitled to receive reasonable and necessary accommodations.  HCDE's practice of training and directing ABS East staff to restrain children by physically forcing these children to the floor was dangerous and discriminatory.[6] Ex. A-5 (Jackson Dep. 63:8–25, 64:1–2, 67:9–13, 69:13–17); Ex. E, Angletti Dec. ¶¶ 2, 3.  Within weeks, at least two different students suffered significant bodily injury from different ABS East staff physically forcing these students to the floor.  Exs. A-21 (Allen Termination Memo); A-22 (Alexander Termination Memo) (A "student sustained serious bodily injury [broken left arm]" from ABS East aide Jacquingamen Alexander restraining the student.).  Robertson acknowledged that "most districts" do not utilize this "emergency floor procedure."  Ex. A-6 (Robertson Dep. 51:18–23, 58:12–24, 59:1–3).  Further, she testified that staff do not perform take-down restraints at her current general

---

[6] *See Floor Restraints vs. Non-Floor Restraints*, *supra* fig. 1 (According to HCDE's 2016–2018 restraint records, 90% of restraints recorded were documented as "emergency floor procedure."); Angletti Dec. ¶¶2, 3 (In 2017, ABS East teacher Ron Angeletti expressed concern about HCDE's "overuse of restraints" and inadequate training related to restraints and de-escalation strategies.).

education disciplinary alternative education campus. *Id*. at 58:12–24, 59:1–3. Herbert Allen, Jr. also testified that staff are not trained to perform these floor restraints at his current general education campus. Ex. A-8 (Allen Dep. 27:3–5, 29:17–20). Though HCDE claims to have adopted CPI's program, CPI has expressly denounced physically forcing an individual to the floor due to the high risk of significant injury. Ex. B, Hippe Dec. ¶10; Ex. A-25 (CPI Risk of Restraints) ("There is also a psychological danger in using restraints. Being restrained can be a frightening- even traumatic – experience . . . . [F]acedown (prone) floor restraints . . . are extremely dangerous. This includes . . . any facedown position on a bed or mat.").

In addition to failing to provide any of K.W.'s necessary disability-related accommodations, ABS East teacher Herbert Allen, Jr. physically assaulted K.W. because of K.W.'s disability-related behaviors. Exs. A-15(Video); A-22 (Allen Termination Memo). The February 22, 2018 IEP detailed the impact of K.W.'s disabilities and behaviors related to his disabilities. Ex. A-14 (K.W. IEP). Allen's justification and other staff statements reveal that Allen's discriminatory actions were a direct response to K.W.'s disability-related behaviors. Exs. A-19 (Witness Statements), A-23 (Record of Communication with Parent). ABS East aide Thomas Wilson stated that the "[s]tudent was being disruptive and getting into arguments with other students. While cursing at Coach Allen the CPI Team Control Position (Emergency Floor Procedure) was administered." Ex. A-19 (Witness Statement). ABS East assistant principal George Sanders documented that K.W. "was involved in a restraint during PE class today. Student was cursing and verbally threatening the PE Coach." Ex. A-23 (Record of Communication with Parent). In the Written Summary, Allen and Sanders documented that K.W. "became verbally and physically non-compliant... [and] non-compliant with all directives." Ex. A-20 (Restraint Form). ABS East aide Harold Young also documented that K.W. "was re-directed to stop cursing but refused to follow directives given . . . . The CPI Team Control Position (Emergency Floor Procedure) was used to calm [K.W.]."

17

Ex. A-19 (Witness Statements).

In *Rideau v. Keller Independent School District*, genuine issues of material fact existed for ADA and Section 504 intentional discrimination claims where a special education teacher violated district policy and mistreated a student with disabilities, resulting in the student's significant injuries. 978 F. Supp. 2d 678, 683–84 (N.D. Tex. 2013).  Here, the records describe Allen's physical assault of K.W. as the following:

> Mr. Allen was face-to-face with the student, grabbed the student, threw him to the gym floor, got on top of the student, then stood up and flung the student on the floor two more times . . . .
>
> The student was not a danger to himself or others, nor did he destroy property.
>
> The student was in a defenseless position against the wall and was grabbed, then thrown to the floor. As a result of Mr. Allen failing to follow restraint procedures, the student sustained serious bodily injury.

Ex. A-21(Allen Termination Memo).  ABS East assistant principal George Sanders, aide Thomas Wilson, and aide Harold Young all witnessed Allen's aggressive actions towards K.W., but none of them intervened to protect K.W. or stop Allen's discriminatory actions against K.W.  Exs. A-15 (Video); A-19 (Witness Statements); A-21 (Allen Termination Memo).  Moreover, following *Delano-Pyle*, this single interaction can be sufficient to prove intentional discrimination.  302 F.3d at 575–76 (concluding a police officer's failure to attempt any alternative method of communication while conducting sobriety tests and an arrest of a person who was hearing-impaired constituted intentional discrimination).

HCDE mischaracterizes the holding in *Washington ex rel. J.W v. Katy Independent School District.* 403 F. Supp. 3d 610, 622–23 (S.D. Tex. 2019).  In *Washington*, the court simply stated that "[t]he Fifth Circuit has not articulated a clear standard for intentional discrimination under § 504 and Title II in the school context, but courts in this circuit have concluded that 'the plaintiff must link the discrimination claims to some evidence of prejudice, ill-will, or spite,' or, at the least, show

deliberate indifference." *Id.* at 622 (collecting cases).   As explained in *S.C. v. Round Rock Independent School District*, "the Fifth Circuit has not delineated 'the precise contours' of what is required to show intentional discrimination and has not stated that a plaintiff must show prejudice, ill-will, or spite."  No. A-19-CV-1177-SH, 2020 WL 5351077, at *5 (W.D. Tex. Sept. 4, 2020) (finding that Round Rock ISD's reliance on *Washington* was misplaced.); *see also Round Rock Indep. Sch. Dist. v. Amy M.*, No. 1:20-CV-496-LY, 2021 WL 2102837, at *8 (W.D. Tex. May 19, 2021) (finding that Round Rock ISD's reliance on *Washington* was misplaced and that the student's allegations were sufficient to "state a plausible claim of intentional discrimination").

Additionally, HCDE misstates K.W.'s burden to connect HCDE's discrimination by reason of his disabilities and mischaracterizes the holding in *Brown v. Coulston*.  463 F. Supp. 3d 762, 783–84 (E.D. Tex. 2020).   K.W. is not required to identify a "specific comparator" or evidence that HCDE would have taken different actions if K.W. did not have disabilities. *Taylor v. Richmond State Supported Living Ctr*, No. CIV.A. 4:11-3740, 2012 WL 6020372, at *6 (S.D. Tex. Nov. 30, 2012) ("The Court also is not persuaded that Plaintiffs' claims are doomed by their failure to identify in the pleadings a specific comparator.").   Further, unlike the material facts in *Brown,* HCDE had direct knowledge of K.W.'s disabilities, the impact of his disabilities, and the reasonable accommodations necessary as a result of his disabilities.  463 F. Supp. 3d at 784.

Mr. Allen himself, along with other ABS East staff, acknowledged that Mr. Allen took the action against K.W. because of his disability-related behaviors. Exs. A-16 (Incident Report); A-19 (Witness Statements); A-20 (Restraint Form); A-21 (Allen Termination Memo).  Additionally, CPS investigated Mr. Allen's actions and found "reason to believe" that he had physically abused K.W. Ex. D-1 (DFPS Letter).  Therefore, as HCDE's agent, Mr. Allen's physical assault against K.W. and his deliberate failure to provide K.W. with his necessary accommodations, along with the failure of other HCDE staff to intervene on K.W.'s behalf during the physical assault, equates to intentional

disability discrimination.  As a result of this discrimination, K.W. sustained significant bodily injury, including a broken collarbone and a brain injury that causes headaches and seizures.  Ex. D, (Plumber Dec. ¶6), Ex. A-24 (Medical Referral).  K.W. has also been diagnosed with PTSD after the assault and was not able to attend school, resulting in him having to be placed on homebound instruction, where he only received four hours of academic instruction each day. *Id*.

## V.    CONCLUSION

For the above reasons, Plaintiffs urge the Court to deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

 /s/ *Brandon W. Duke*
Brandon W Duke
S.D. Adm. No. 2857734
State Bar No. 24094476
bduke@winston.com
Rachael E. Thompson
S.D. Adm. No. 3640278
State Bar No. 24117139
rthompson@winston.com
Winston & Strawn, LLP
800 Capitol St., Suite 2400
Houston, Texas 77002
Phone 713.651.2600
Fax 713.651.2700

L. Kym Davis Rogers
S.D. Adm. No. 3640648
State Bar No. 00796442
krogers@disabilityrightstx.org
Disability Rights Texas
1420 W. Mockingbird Lane, Suite 450
Dallas, Texas 75247
Phone 214.845.4045
Fax 214.630.3472

Shiloh Carter
S.D. Adm. No. 2898136
State Bar No. 24080321

scarter@disabilityrightstx.org
Disability Rights Texas
1500 McGowen, Suite 100
Houston, Texas 77004
Phone 281.836.0736
Fax 713.974.7695

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been served on all known counsel of record via CM/ECF on June 4, 2021.

Jon Erik Nichols
enichols@kbslawgroup.com
Melissa M. Goins
mgoins@kbslawgroup.com
Karczewski Bradshaw Spalding
3700 Buffalo Speedway, Suite 560
Houston, TX 77098
713-993-7060
Fax: 888-726-8374

*Counsel for Defendant*

/s/ *Brandon W. Duke*
Brandon W Duke